Copy

1  Elizabeth J. Cabraser (State Bar No. 083151)
   *ecabraser@lchb.com*
2  Robert J. Nelson (State Bar No. 132797)
   *rnelson@lchb.com*
3  Todd A. Walburg (State Bar No. 213063)
   *twalburg@lchb.com*
4  LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
5  275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
6  Telephone: (415) 956-1000
   Facsimile: (415) 956-1008
7
   *Attorneys for the Plaintiff*
8

9               UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF CALIFORNIA
10              (WESTERN DIVISION – LOS ANGELES)

11  HARRY WILLIAMS,                    CASE NO.

12              Plaintiff,             CV10-7366 GW (PSWx)
                                       **COMPLAINT FOR DAMAGES**
13        v
                                       **[Products Liability – Toyota Sudden
14  TOYOTA MOTOR NORTH                 Unintended Acceleration Resulting in
    AMERICA, INC., TOYOTA              Personal Injuries]**
15  MOTOR ENGINEERING &
    MANUFACTURING NORTH                1) Negligence
16  AMERICA, INC., TOYOTA              2) Strict Products Liability: Design
    MOTOR MANUFACTURING,               Defect
17  CALIFORNIA, INC., TOYOTA
    MOTOR SALES, U.S.A., INC,          3) Strict Products Liability: Failure to
18  TOYOTA MOTOR                       Warn
    CORPORATION, CTS
19  CORPORATION and DOES 1             4) Breach of Implied Warranty
    through 10, inclusive,             5) Fraud and Deceit: Fraudulent
20                                     Concealment
                Defendants.
21                                     6) Violation of California's False
                                       Advertising Laws, California Business
22                                     and Professions Code §§ 17500 *et seq.*)
23                                     7) Claim for Punitive Damages

24                                     **DEMAND FOR JURY TRIAL**

25

26

27

28

859537.1                                            COMPLAINT FOR DAMAGES
                                                    CASE NO _____

1          COMES NOW Plaintiff HARRY WILLIAMS,("Plaintiff"), by and

2  through his counsel, Lieff Cabraser Heimann & Bernstein, LLP, and alleges as

3  follows:

4                   **INTRODUCTION**

5          1.     This product liability action involves the 2009 Toyota Camry

6  ("subject vehicle'), which was designed, manufactured, marketed, promoted, sold

7  and distributed by the Toyota entity defendants.

8          2.     Certain of Toyota's cars and trucks have a defect that causes

9  sudden uncontrolled acceleration to speeds of up to 100 miles per hour or more.

10  This defect is combined with the operator's inability to stop the vehicle during such

11  an incident due to defective electronics and the absence of a properly designed fail-

12  safe, such as a brake-to-idle override system.  These defects alone, or in

13  combination, are lethal.

14          3.     Data compiled by Safety Research and Strategies, Inc., an

15  automotive safety research organization, shows that Toyota sudden acceleration

16  incidents have accounted for, at least, 725 crashes, 304 injuries, and 18 fatalities.

17  More current statistics show that there have been over 34 deaths.

18          4.     Toyota has known about the problems associated with sudden

19  unintended acceleration for some time.  Instead of recalling the vehicles and

20  changing their design to improve safety, Toyota essentially hid the problem.  This

21  has resulted in numerous injuries and fatalities.

22                     **PARTIES**

23          5.     At all times herein mentioned, Plaintiff HARRY WILLIAMS, a

24  retired U.S. Army Colonel who currently works at the Pentagon, was a resident of

25  Woodbridge, Virginia.

26          6.     At all times herein mentioned, Defendant Toyota Motor North

27  America, Inc. was and is a California corporation, and a corporate citizen of

28

1   California, with its principal place of business at 19001 South Western Avenue, in

2   the City of Torrance, County of Los Angeles, in the State of California.

3           7.      At all times herein mentioned, Defendant Toyota Motor

4   Manufacturing, California, Inc., was and is a California corporation and a corporate

5   citizen of California, with its principal place of business in California.

6           8.      At all times herein mentioned, Defendant Toyota Motor

7   Engineering & Manufacturing of North America was and is a Kentucky

8   corporation, with its principal place of business located at 25 Atlantic Avenue,

9   Erlanger, Kentucky 41018.

10          9.      At all times referenced herein, Defendant Toyota Motor Sales,

11  Inc. was and is a California corporation existing under and by virtue of the laws of

12  incorporation of the State of California, having its headquarters and its principal

13  place of business at 19001 South Western Avenue, in the City of Torrance, County

14  of Los Angeles, in the State of California.

15          10.     Upon information and belief, each Toyota entity named above is

16  a wholly owned subsidiary of the Japanese corporation, Toyota Motor Corporation.

17  At all times herein mentioned, Defendants Toyota Motor North America, Inc.,

18  Toyota Motor Engineering & Manufacturing of North America, Toyota Motor

19  Manufacturing, California, Inc., Toyota Motor Sales, Inc., and Toyota Motor

20  Corporation and DOES 1 through 10, inclusive, designed, engineered, developed,

21  manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or

22  failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled,

23  advertised, promoted, marketed, supplied, distributed, wholesaled, and sold Toyota

24  vehicles, including the vehicle operated by Plaintiff.

25          11.     At all times herein mentioned, Defendant CTS Corporation was

26  and is an Indiana corporation, with its principal place of business located at Elkhart,

27  Indiana.  Plaintiff alleges that CTS Corporation and DOES 1 through 10, inclusive,

28  designed and manufactured accelerator pedals for the Toyota entities.

1       12.    At all times referenced herein, Defendants, and each of them, were acting as agents and employees of each of the other Defendants, and were acting within the scope, purpose, and authority of that agency and employment and with the full knowledge, permission, and consent of each of the other Defendants.

13.    Plaintiff is ignorant of the true and correct names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is a company that placed a defective product into the stream of commerce, and/or is an agent, employee, joint venturer, or affiliate of the other Defendants, and is responsible for the unlawful conduct herein alleged, and that said Defendants proximately caused the harm alleged herein.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy is greater than $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship among the parties.

15.    This Court has personal jurisdiction over the Defendants because Defendants have transacted business and their affairs in the Central District of California, and because Defendants have committed acts and omissions complained of in the State of California.

16.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.  In addition, all of the Defendants are subject to personal jurisdiction in this judicial district.

CASE NO. _____

**FACTUAL BACKGROUND**

17.     Toyota is currently the world's largest manufacturer of vehicles with net revenues in 2009 of over $227 billion.

18.     Beginning in the late 1990s, Toyota manufactured, distributed and sold vehicles with an electronic throttle control system ("ETC").

19.     Unlike that of traditional throttle control systems, where a physical linkage connects the accelerator pedal to the engine throttle, in the ETC system, the engine throttle is controlled by electronic signals sent from the gas pedal to the engine throttle.  A sensor at the accelerator detects how far the gas pedal is depressed and transmits that information to a computer module which controls a motorized engine throttle.  The computer module determines how far the accelerator is depressed, and, in turn, tells the engine throttle motor how far to open the throttle valve.

20.     When Toyota first introduced the ETC, they continued to include a mechanical linkage between the accelerator and the engine throttle control.

21.     Beginning with the 2002 model year, however, Defendants began manufacturing, distributing, and selling vehicles without such mechanical linkage.

22.     Further, Defendants' ETC system also fails to include a failsafe measure incorporated by other vehicle manufacturers which instructs the ETC system to automatically reduce the engine to idle whenever the brakes are applied without success.

23.     The combination of the lack of these two safety systems allows the ETC to set the engine throttle to any position regardless of the position of the accelerator, and with no mechanical or electronic failsafe mechanism to allow the driver to effectively stop or slow the car in such circumstances, resulting in numerous injuries and deaths.

24.     According to an article in the November 8, 2009 issue of the *Los Angeles Times* ("*LA Times*"), the *LA Times* located federal and other records of 19 fatalities and over 1,000 reports by owners involving the unintended acceleration of Toyota vehicles from the 2002 model year and newer.

25.     The *LA Times* further quotes an independent safety expert as stating that he had identified nearly 2,000 sudden-acceleration cases for Toyota vehicles built since 2001.

26.     The *LA Times* further states that other experts believe the numbers may be far higher, citing to a 2007 NHTSA survey of 600 Lexus owners that found that 10% complained they had experienced sudden acceleration.

27.     The *LA Times* further states that when Toyota reported complaint data to NHTSA, Toyota eliminated all reports claiming that the sudden acceleration occurred for "a long duration" or more than a few seconds.

28.     The *LA Times* further states that in an investigation of reports of sudden acceleration involving 2002 and 2003 Lexus ES and Camry models, Toyota eliminated all reports in five broad categories when responding to NHTSA's request, excluding all cases in which the drivers said they were unable to control a runaway engine by applying the brakes.

29.     Thus, at all relevant times, Toyota had full knowledge of the numerous complaints regarding its vehicles, that such vehicles were susceptible to incidents of sudden unintended acceleration, and thus that such vehicles posed a significant risk of injury and death to vehicle occupants, other motorists, and pedestrians.

30.     Toyota knew, or should have known, about the risks of sudden unintended acceleration present in Toyota vehicles for many years, based upon the following timeline of events:

**<u>1992</u>**

NHTSA's Office of Defects Investigation

1    undertook an investigation of 1987-1989 Toyota Camry

2    and Toyota Celica vehicles based upon 556 complaints

3    and 30 accidents resulting from sudden acceleration when

4    a sticking throttle caused unwanted engine power.

5    **2001**

6        2002 Model Year Camry is substantially

7    redesigned on a new platform. The ETCS-i system was

8    one of several new or revised vehicle systems (including

9    transmission and braking system) introduced for the

10    model year 2002 subject vehicles, consisting of an

11    accelerator pedal sensor, a throttle control motor, a

12    throttle position sensor and the engine control module

13    (ECM). To control throttle position and monitor system

14    operation, the system uses redundant hardware at the APS

15    and TPS main and sub sensor and the ECM (main and sub

16    processor).

17        Toyota warns that the installation of a mobile two-

18    way radio system could affect electronic systems,

19    including the fuel injection, electronic throttle control

20    system, cruise control system, and other electronics.

21    Owner's are told to "be sure to check with your Toyota

22    dealer for precautionary measures or special instructions

23    regarding installation."

24    **2002**

25        *February 2, 2002:* First consumer complaint of

26    2002 Camry engine surging when the brakes were

27    depressed.

28        *August 30, 2002:* Toyota issues Technical Service

1  Bulletin TSB EG017-02 to update the Electronic Control

2  Module calibration to address "engine surging" on 2002

3  Camrys with 1MZ-FE engine.

4  "Vehicles may exhibit a surging during light

5  throttle input at speeds between 38 – 42 MPH . . . The

6  Engine Control Module (ECM) calibration has been

7  revised to correct this condition."

8  *August 31, 2002:*   First warranty claim noted by

9  Toyota to correct a throttle problem on a 2002 Camry.

10  **2003**

11  *April, 2003:*  Driver of a Toyota Sienna experiences

12  an unwanted acceleration incident that occurred during

13  production Dynamometer testing. The incident was

14  allegedly caused by a missing retaining clip that allowed

15  the center console trim panel to interfere with (trap) the

16  accelerator pedal after it had been depressed. In the

17  aftermath, Toyota reviewed their manufacturing processes

18  and other data and concluded this was an isolated

19  incident. As a secondary measure in June 2003, Toyota

20  changed the design of the trim panel to eliminate the

21  potential for pedal interference in the event the retaining

22  clip is not present.

23  *April 17, 2003:*  Peter Boddaert of Braintree, Mass.

24  reports sudden unintended acceleration incident to

25  NHTSA involving his 1999 Lexus LS 400.

26  *April 25, 2003:*  Peter Boddaert petitions NHTSA

27  to conduct an analysis of 1997 through 2000 model year

28  Lexus 300 and 400 series vehicles for problems of vehicle

speed control linkages and sudden unexpected excessive
acceleration. Boddaert cites 271 other complaints to the
agency about these vehicles, with 36 referring specifically
to sudden unintended acceleration, including several
crashes. Boddaert previously complained to the agency
about sudden unintended acceleration when he
experienced the first of three sudden unintended
acceleration events. The final instance resulted in
Boddaert rear-ending another vehicle.

*May 16, 2003:*  Toyota issues Technical Service
Bulletin TSB EG008-03 to update the Electronic Control
Module calibration to address "engine surging" in 2003
Camry's with 1MZ-FE engine.

"Vehicles may exhibit surging during light throttle
input at speeds between 38 – 42 mph… The Engine
Control Module (ECM) calibration has been revised to
correct this condition."

*June 3, 2003:*  Toyota changes the shape of the trim
panel on the 2004 Sienna after an incident during
production in which trim panel interference resulted in a
sudden unintended acceleration event.

*September 22, 2003:*  NHTSA denies the Boddaert
petition (DP03003). The agency says that its analysis of
speed control complaints involving the Lexus and other
peer luxury vehicles shows that Toyota is not a statistical
stand-out.

**2004**

*January 15, 2004:*  Ms. Carol J. Mathews of

1    Rockville, Maryland submits a petition to NHTSA
2    requesting an investigation of 2002 and 2003 Lexus
3    ES300 for a defect in the vehicle speed control linkages.
4    She alleged that the throttle control system in her vehicle
5    malfunctioned on multiple occasions and was the cause of
6    a vehicle crash.
7        *February 17, 2004:*  NHTSA formally begins
8    DP04003 to investigate Matthews request.
9        *March 5, 2004:*  NHTSA grants Matthews petition
10   request and opens defect investigation into 2002 – 2003
11   Camry, Camry Solara and Lexus ES300. The agency
12   reports 37 complaints and 30 crashes resulting in 5
13   injuries in the subject vehicles.
14       According to the complaints, the Toyota vehicles
15   suddenly and unexpectedly surge or accelerate, generally
16   of short duration; some reports allege multiple
17   occurrences or occurrences during slow speed vehicle
18   maneuvers and/or after shifting the transmission and/or at
19   higher speeds under cruise control operation. In most
20   cases, the brake system was reportedly functional and
21   could be used to control the vehicle when the condition
22   occurred.
23       *June 4, 2004:*  Toyota sends response to NHTSA
24   investigation into unexpected acceleration in Camry /
25   Lexus ES 300 (PE04021). Toyota denies a defect exists,
26   claims there is no trend, and that its electronic control
27   system cannot fail in ways its engineers have not already
28   perceived.

859537.1                            - 9 -                    COMPLAINT FOR DAMAGES
                                                             CASE NO. _____

1          *July 22, 2004:* NHTSA's Office of Defects

2   Investigation closes its investigation of 2002-2003

3   Camrys, Camry Solara and Lexus 300ES vehicles without

4   finding a defect (PE04021). The agency concluded with

5   its standard caveat: "A defect trend has not been

6   identified at this time and further use of agency resources

7   does not appear to be warranted. Accordingly, this

8   investigation is closed. The closing of this investigation

9   does not constitute a finding by NHTSA that a safety-

10  related defect does not exist. The Agency will take further

11  action if warranted by the circumstances."

12         *November 3:* Toyota reports first consumer

13  complaint of engine surging in a 2005 Tacoma.

14  **2005**

15         *July 8, 2005:* Jordan Ziprin of Phoenix, AZ

16  petitions NHTSA to open a defect investigation into

17  sudden unintended acceleration in the 2002 – 2005

18  Toyota / Lexus models for sudden unintended

19  acceleration. Ziprin previously reported a sudden

20  unintended acceleration event in his 2002 Toyota Camry

21  which resulted in a property damage crash.

22         *August 5, 2005:* NHTSA opens Defect Petition

23  investigation (DP05002), based on the request of Jordan

24  Ziprin. Target population is 2002-2005 Camrys and Lexus

25  ES models.

26         *November 15, 2005:* Toyota files final response in

27  DP05002, in which it says that it believes no defect or

28  defect trend exists. Toyota completely discounts drivers'

experiences noting that the experiences as described could not have occurred without the fault detection system taking note. Toyota also noted that it reviewed the complaints to NHTSA and found that there are two major allegations; one is that the vehicle unintentionally or suddenly "ACCELERATED" and the other is that the vehicle "SURGED" or "LURCHED". Toyota believes that these two descriptions of vehicle behavior are two completely different issues.

**2006**

*January 5, 2006:* NHTSA closes DP05002 and denies the Ziprin petition. NHTSA says it examined 1172 owner complaints in a population of 7 million vehicles and could find no trend.

*July, 2006:* Toyota changes Floor Carpet Cover on Toyota Highlander and Lexus RX vehicles.

*August 24, 2006:* William Jefferson III petitions NHTSA to investigate 2002 – 2006 Camry and Camry Solara vehicles for incidents relating to vehicle surging. The petitioner owned a 2006 Camry and previously owned a 2003 Camry. He alleged that both vehicles exhibited "Engine Surging" which he described as a short duration (1 to 2 second) increase in engine speed occurring while the accelerator pedal is not depressed. For the 2006 vehicle, the petitioner estimated 6 to 8 surge incidents, of varying magnitude, occurred over the course of 10,000 miles and nearly 7 months of ownership.

*September 14, 2006:* ODI opens Defect Petition

1   DP06003 in response to petition from William Jefferson

2   III.

3       *December 20, 2006:*  Toyota responds to NHTSA

4   request in DP06003. Toyota noted the results of an

5   investigation of the throttle actuator recovered from the

6   Petitioner's vehicle, and said that it could find no

7   abnormality. During the investigations of other returned

8   throttle actuators, Toyota found that some parts inside the

9   throttle actuator had corroded due to water intrusion,

10  concentrated in specific areas where water could intrude

11  into the throttle actuator from the drain hose. Toyota

12  blamed this on heavy weather conditions such as a

13  flooded road or a hurricane. "Although the rate of

14  occurrence of this type of failure is low, to eliminate any

15  possibility of water intrusion under such circumstances,

16  Toyota modified the drain hose.

17  **2007**

18      *February 5, 2007:*  Ezal fatal crash in San Luis

19  Obispo, CA involving 2005 Camry.

20      *March 5, 2007:*  NHTSA denies the Jefferson

21  Petition stating it has not identified a vehicle-based

22  defect, nor was it able to witness such an event when road

23  testing the Petitioner's vehicle. An evaluation of a suspect

24  throttle actuator removed from the Petitioner's vehicle did

25  not reveal a component problem.

26  NHTSA notes: "This in no way implies that we doubt the

27  Petitioner's reported experiences with his vehicle. Rather,

28  the agency simply lacks evidence of a safety related

1   defect in his vehicle or a trend of such defects in the

2   subject vehicles. In view of the foregoing, it is unlikely

3   that NHTSA would issue an order for the notification and

4   remedy of a safety-related defect as alleged by the

5   Petitioner in the subject vehicles at the conclusion of the

6   requested investigation. Therefore, in view of the need to

7   allocate and prioritize NHTSA's limited resources to best

8   accomplish the agency's safety mission, the petition is

9   denied."

10   *March 29, 2007:*  NHTSA opens a low-level

11   investigation (PE07016) into 80,000 2007 Lexus ES350

12   for accessory floor mat interference with the throttle

13   pedal. NHTSA's Office of Defects Investigation notes

14   that these vehicles come equipped with a standard floor

15   mat made from a carpeted material.

16   *April 12, 2007:*  Toyota sends notification to

17   dealers that it will be contacting Lexus customers about

18   proper floor mat usage.

19   *August 8, 2007:*  NHTSA upgrades PE07016 to

20   EA07010 to further investigate unintended acceleration in

21   2007 Lexus ES350s. The agency notes 40 complaints;

22   eight crashes and 12 injuries. Complainants interviewed

23   by ODI stated that they applied the throttle pedal to

24   accelerate the vehicle then experienced unwanted

25   acceleration after release. Subsequent (and sometimes

26   repeated) applications of the brake pedal reduced

27   acceleration but did not stop the vehicle.

28   *August 30, 2007:*  NHTSA files memo in EA07010

1   about the inspection of a Lexus ES350 that experienced a

2   sudden unintended acceleration incident and conducted a

3   telephone interview with the owners. An inspection of the

4   vehicle found all weather mats are installed at all four

5   seating positions. The driver side all weather mat was

6   found to be installed by itself; it was not on top of another

7   floor mat. The installed mat was found to be unsecured by

8   the retention hooks; the mat did not interfere with the

9   accelerator pedal in the position it was originally

10   inspected.

11   *September, 2007:*  Bookout fatal crash in Oklahoma

12   involving 2005 Camry.

13   *September 26, 2007:*  Toyota issues Recall 07E-082

14   involving 55,000 Lexus/Toyota with optional All Weather

15   Floor Mats manufactured January 3, 2006-September 13,

16   2007. All owners of 2007 and early 2008 model year

17   Lexus ES350 and Toyota Camry vehicles were to be

18   notified of the safety campaign and the timing when the

19   replacement mats will become available. Toyota also

20   stopped the sale of the Toyota/Lexus All Weather Floor

21   Mat designed specifically for 2007 and early 2008 model

22   year Camry and ES 350 Lexus vehicles.

23   *October 10, 2007:* NHTSA's Office of Defects

24   Investigation interviews another complainant in

25   EA07010, in which she tells investigator about the run-up

26   to a rollover involving a Lexus ES350. The investigator

27   concludes it resulted from an unsecured floor mat.

28   *October 11, 2007:*  ODI closes EA07010 into

accessory floor mat interference in 2002 – 2008 Lexus
ES350 and Camry vehicles in the wake of Recall 07E-
082.

**<u>2008</u>**

*January 10, 2008:*  William Kronholm of Helena,
MT files a request for a defect investigation into Sudden
Unintended Acceleration in 2006 Tacomas. Kronholm
experienced two incidents of sudden unintended
acceleration and investigated the agency complaints
database and found 32 complaints involving the trucks.

*January 31, 2008:*  NHTSA's Office of Defects
Investigation opens investigation DP08001 into sudden
unintended acceleration in 2006, 2007 Tacomas, based
Kronholm's defect petition and on 31 complaints to the
agency.

*April 10, 2008:*  NHTSA opens low-level
investigation PE08025 into SUA involving 54,000 2004
Toyota Siennas, based on a report alleging unwanted
acceleration on a subject vehicle. The complainant
reported that he applied the accelerator pedal to accelerate
the vehicle and experienced unwanted acceleration upon
release. Field data collected by NHTSA's Office of
Defects Investigation indicates that when a retainer pin is
missing from the driver's side center stack/console trim
panel, the panel can detach from the console and the
accelerator pedal can become entrapped under the trim
panel causing unwanted acceleration.

*April 18, 2008:*  Toyota responds to NHTSA

1  information request in the Kronholm petition and reports
2  a total of 326 unique vehicle complaints of sudden
3  unintended acceleration in Tacomas.
4        As part of PE08025, the NHTSA Vehicle Research
5  and Test Center is asked to conduct tests of 2004 Toyota
6  Sienna vans for a condition that can cause the engine to
7  produce power when the accelerator is not depressed.
8  NHTSA notes that the driver's side trim panel, which is
9  secured by a trim clip to the center console, can become
10  detached and prevent the pedal from returning to the fully
11  closed position.
12        *April 25, 2008:*  Toyota's response to NHTSA's
13  request in response to the Kronholm petition on Tacoma
14  SUA (DP08001) claims that there is no trend; the
15  complaints have been artificially inflated by media
16  attention and by Tacoma web groups.
17        *April 30, 2008:*  ODI issues Final Report in its
18  investigation of floor mats (EA07010). The Vehicle
19  Research and Test Center (VRTC) tested a Lexus ES-350.
20  During its tests of the vehicle electronics, the VRTC said
21  that it introduced multiple electrical signals into the
22  electrical system to test the robustness of the electronics
23  against single point electrical interference failures and
24  could not identify the problem.
25        The VTRC also sent surveys to 1986 registered
26  owners of a 2007 Lexus ES-350 requesting information
27  regarding episodes of unintended acceleration. Of the 600
28  people that responded, 59 stated that they experienced

1    unintended acceleration and 35 complained of pedal

2    interference with the Lexus rubber all-weather floor mats.

3        *June 25, 2008:*  In response to the Sienna

4    investigation (PE08025) regarding 2004 Siennas, Toyota

5    reported complaints about sudden unintended acceleration

6    in Siennas that take two forms: allegations of excessive

7    engine speed and/or power output without the driver

8    pressing on the accelerator pedal or the engine speed and

9    or power output failing to decrease (subside) when the

10   accelerator pedal was no longer being depressed by the

11   driver. Toyota also says that it sees no evidence of a

12   defect and explains how the trim could catch the

13   accelerator and the design changes it made to the trim

14   panel to correct this.

15       *August 8, 2008:*  NHTSA upgrades its investigation

16   of 2004 Sienna sudden unintended acceleration to an

17   Engineering Analysis (EA08014).

18       *August 27, 2008:*  NHTSA closes investigation its

19   investigation into Tacomas (DP08001) and denies

20   Kronholm petition. The agency concludes that it is unable

21   to find an explanation and have been unable to determine

22   a cause for sudden unintended acceleration complaints in

23   Tacomas.

24       *October 15, 2008:*  Toyota made a presentation to

25   NHTSA on sudden unintended acceleration and trim

26   interference in 2004 Siennas. Toyota demonstrated how

27   an unrestrained early design level trim panel interacts

28   with the accelerator after pedal depression. Toyota also

advised that it was conducting a field survey to examine
panel retention and that preliminarily one vehicle had
been identified with a concern.

**2009**

*January 26, 2009:*  NHTSA closes its investigation
into 2004 Sienna sudden unintended acceleration after
Toyota agrees to recall vehicles built between January 10,
2003 and June 11, 2003, when the original design floor
carpet cover was used in production.

Toyota issues Recall 09V-023 for 26,501 2004
Siennas. Toyota does not concede that this is a defect, but
calls the actions a "safety improvement campaign" that is
not being conducted under the Safety Act. Toyota's recall
instructs dealers to replace the original floor carpet cover
with the newer design floor carpet (and retention clip) at
no charge to the owner. The repair will reduce the
potential for trim panel interference with the accelerator
pedal travel should the retaining clips become missing
because of improper service or other reasons.

*March 19, 2009:*  Jeffrey Pepski of Plymouth
Minnesota files a defect petition requesting NHTSA to re-
open the sudden unintended acceleration investigation
into Lexus vehicles requesting "an additional
investigation into the unwanted and unintended
acceleration of model year [MY] 2007 Lexus ES350 as
the initial investigation (PE7-016) was too narrow in
scope and did not adequately address all complaints made
to the NHTSA with respect to vehicle speed control

concerns." Additionally the petitioner requested an "investigation of MY 2002-2003 Lexus ES300 for those 'longer duration incidents involving uncontrollable acceleration where brake pedal application allegedly had no effect' that were determined not to be within the scope of Investigation PE04-021.

*May 14, 2009:*  Toyota files a direct response to Pepski's petition in DP09001. Toyota dismisses all of the issues Pepski raises in his petition and says there is no basis for an investigation. Toyota claims that when Lexus inspected Pepski's vehicle, it found that the floor mat was unsecured and blamed the event on that

*August 28, 2009:*  Fatal Saylor crash in Santee, CA involving a 2009 Lexus ES350.

*September 29, 2009:*  The National Highway Traffic Safety Administration and Toyota issues consumer alerts urging owners of a wide range of Toyota and Lexus models to take out any removable driver's floor mat and not replace it with any other floor mat. Toyota says that an examination of recent events prompted the alert. The affected models are:

2007 – 2010 Camry

2005 – 2010 Avalon

2004 – 2009 Prius

2005 – 2010 Tacoma

2007 – 2010 Tundra

2007 – 2010 ES350

2006 – 2010 IS250 and IS350

1     *October 5, 2009:*  Toyota initiates Recall 09V-388

2  to address potential accelerator pedal entrapment by floor

3  mats in approximately 3.8 million vehicles.

4     *October 28, 2009:*  NHTSA closes Defect Petition

5  09001. The Office of Defects Investigations' analysis

6  concludes 78 percent of the complaints involved incidents

7  of floor mat interference, including all of the crashes and

8  injuries:

9     *November 3, 2009:*  Toyota issues a statement

10  characterizing the closing of Defect Petition 09-001 as

11  proof "that no defect exists in vehicles in which the

12  driver's floor mat is compatible with the vehicle and

13  properly secured."

14     *November 4, 2009:*  NHTSA swiftly issues a

15  statement to correct Toyota's statement that the

16  investigation is over:

17    "Toyota has announced a safety recall involving 3.8

18  million vehicles in which the accelerator pedal may

19  become stuck at high vehicle speeds due to interference

20  by the driver's side floor mat, which is obviously a very

21  dangerous situation. Toyota has written to vehicle owners

22  stating that it has decided that a safety defect exists in

23  their vehicles and asking owners to remove all floor mats

24  while the company is developing a remedy. We believe

25  consumers should follow Toyota's recommendation to

26  address the most immediate safety risk. However,

27  removal of the mats is simply an interim measure, not a

28  remedy of the underlying defect in the vehicles. NHTSA

1    is discussing with Toyota what the appropriate vehicle

2    remedy or remedies will be. This matter is not closed until

3    Toyota has effectively addressed the vehicle defect by

4    providing a suitable remedy."

5          *November 25, 2009:* Toyota announces plans to

6    reconfigure the accelerator pedal on 3.8 million vehicles

7    going back to the 2004 model year. Other fixes include

8    modifying the floor area around the pedal and in some

9    models, installing a brake-to-idle override that allows the

10   driver to quickly stop a vehicle in an unintended

11   acceleration incident and newly-designed replacement

12   driver- and front-passenger side all-weather mats.

13                    The recalled vehicles include:

14                         2007-2010 Camry

15                         2005 -2010 Avalon

16                         2004 -2009 Prius

17                         2005-2010 Tacoma

18                         2007-2010 Tundra

19                         2007-2010 Lexus ES 350

20                         2006-2010 Lexus IS 250

21                         2006 – 2010 Lexus IS 350.

22         *November 27, 2009:* NHTSA receives anonymous

23   tip from a Kentucky city that just happens to be the home

24   of a Toyota-owned supplier of throttle bodies to check out

25   the probability that cracked throttle body shafts are

26   causing SUA. "Concerned Citizen" says Toyota

27   management knows about the problem, but has remained

28   silent.

1    **2010**

2             *January 4, 2010:*  NHTSA posts the anonymous

3    complaint to the public file.

4             *January 22, 2010:*  Toyota announces a new recall

5    for sticky accelerator pedals, separate and apart from the

6    floor mat recall. Toyota says: "Due to the manner in

7    which the friction lever interacts with the sliding surface

8    of the accelerator pedal inside the pedal sensor assembly,

9    the sliding surface of the lever may become smooth

10   during vehicle operation. In this condition, if

11   condensation occurs on the surface, as may occur from

12   heater operation (without A/C) when the pedal assembly

13   is cold, the friction when the accelerator pedal is operated

14   may increase, which may result in the accelerator pedal

15   becoming harder to depress, slower to return, or, in the

16   worst case, mechanically stuck in a partially depressed

17   position. In addition, some of the affected vehicles' pedals

18   were manufactured with friction levers made of a

19   different material (PA46), which may be susceptible to

20   humidity when parked for a long period in hot

21   temperatures. In this condition, the friction when the

22   accelerator pedal is operated may increase, which may

23   result in the accelerator pedal movement becoming rough

24   or slow to return." The affected vehicles are:

25                       2009-2010 RAV4,

26                       2009-2010 Corolla,

27                       2009-2010 Matrix,

28                       2005-2010 Avalon,

1                             2007-2010 Camry,

2                             2010 Highlander,

3                             2007-2010 Tundra,

4                             2008-2010 Sequoia

5          31.     Toyota never made any significant changes to improve the

6 acceleration system and the electrical system, in spite of the availability of safe and

7 inexpensive alternative designs and feasible modifications.

8          32.     According to a Toyota internal document obtained by *The*

9 *Detroit News* on February 21, 2010, Toyota officials bragged in July 2009 about

10 avoiding a costly whole-scale recall related to sudden acceleration complaints.  A

11 limited recall saved Toyota more than $100 million, according to the document,

12 which is an internal presentation from Toyota's Washington office.  The document

13 notes that Toyota's safety officials had saved the company significant expense by

14 limiting the recall to 55,000 floor mats in 2007.  "Negotiated 'equipment' recall on

15 Camry/ES re SA (Sudden Acceleration); saved $100M+, w/ no defect found," the

16 document said.  This internal document is further evidence that Toyota knew about

17 the sudden acceleration problem and nonetheless decided to avoid a recall of the

18 affected vehicles, in conscious disregard for the safety of consumers, including

19 Plaintiff.

20          33.     Toyota knew that a properly designed brake-to-idle override

21 system was necessary to allow drivers to bring a vehicle under control in the event

22 of a sudden acceleration incident.  Toyota made the following statement in

23 November 2009 when they announced their solution to the sudden acceleration

24 problem:

25              In addition, as a separate measure independent of the

26              vehicle-based remedy, Toyota will install a brake override

27              system into the involved Camry, Avalon, and Lexus ES

28              350, IS 350 and IS 250 models as an extra measure of

1    confidence. This system cuts engine power in case of

2    simultaneous application of both the accelerator pedal and

3    brake pedals.

4    Yet, Toyota has failed to install this safety feature on all of the affected

5    vehicles, including the subject vehicle.

6    34.    On February 8, 2010,  Toyota Motor Sales, U.S.A., Inc, also

7    announced a voluntary safety recall on 2010 Prius vehicles and 2010 Lexus HS

8    250h vehicles to update software in the vehicle's anti-lock brake system (ABS).

9    This recall involves approximately 133,000 2010 Prius vehicles and 14,550 2010

10   Lexus HS 250h vehicles.

11   35.    As a result of Toyota's conscious disregard for the safety of

12   consumers, numerous individuals have been killed or severely injured.

13   36.    As a result of Toyota's marketing campaigns, and the guise of

14   safety created by Toyota, numerous consumers purchased and drove Toyota

15   vehicles, including Plaintiff.

16   37.    Plaintiff Harry Williams, age 49, is a retired U.S. Army Colonel

17   who served his country on active duty for 26 years until his retirement in June

18   2008.  During his service, he earned two Master's Degrees and received several

19   awards and honors.  Since his retirement, Harry Williams has served as Chief of the

20   Congressional Inquiry Division with the Office of the Chief of Legislative Liaison

21   at Headquarters, Department of Army, in the Pentagon, Washington, D.C.

22   38.    Plaintiff Harry Williams was and is a safe driver with an

23   excellent driving record of more than 30 years.

24   39.    Prior the subject incident, Plaintiff Harry Williams rented a

25   2009 Toyota Camry from Enterprise-Rent-A-Car. He was unaware of the vehicle's

26   hidden and potentially lethal defects, of which Toyota was or should have been

27   aware.

28

40.     On January 23, 2009, at approximately 7:30 a.m., Harry Williams was the belted driver of the subject 2009 Toyota Camry.  He was driving at a safe rate of speed, proceeding eastbound on Cardinal Drive in Woodbridge, Virginia. As he reached the intersection of Cardinal Drive and Jefferson Davis Highway, the Camry suddenly accelerated at a high rate of speed and he was unable to stop the vehicle by braking.  The Camry impacted a 2005 Dodge Caravan that was attempting to make a left hand turn from Neabsco Road onto southbound Jefferson Davis Highway.

41.     As a result of the collision, Plaintiff Harry Williams suffered a loss of consciousness and sustained serious injuries, including a traumatic brain injury, as well as neck, back and leg injuries.  Residual symptoms of the traumatic brain injury continue to affect all aspects of Plaintiff Harry Williams' daily life.

## TOYOTA DEFENDANTS' CONCEALMENT OF THE DEFECTS

42.     The Toyota Defendants' failure to document or follow up on the known defects in its cars and trucks, and concealment of known defects from the NHTSA, Plaintiff, and the community, constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

43.     According to *Bloomberg*, as reported on February 12, 2010, former regulators hired by Toyota Motor Corp. helped end at least four U.S. investigations of unintended acceleration by company vehicles in the last decade, warding off possible recalls, court and government records show.  According to *Bloomberg*, Christopher Tinto, vice president of regulatory affairs in Toyota's Washington office, and Christopher Santucci, who works for Tinto, helped persuade the National Highway Traffic Safety Administration to end probes including those of 2002-2003 Toyota Camrys and Solaras, court documents show.  According to *Bloomberg*, both men joined Toyota directly from NHTSA, Tinto in 1994 and Santucci in 2003.  According to *Bloomberg*, in one example of the Toyota aides' role, Santucci testified in a Michigan lawsuit that the company and NHTSA

discussed limiting an examination of unintended acceleration complaints to incidents lasting less than a second.  "We discussed the scope" of the investigation, Santucci testified.  "NHTSA's concerns about the scope ultimately led to a decision by the agency to reduce that scope.  You say it worked out well for Toyota, I think it worked out well for both the agency and Toyota."  As reported by *Bloomberg*, NHTSA opened eight investigations of unintended acceleration of Toyota vehicles from 2003 to 2010, according to Safety Research & Strategies Inc., a Rehoboth, Massachusetts, group that gathers data from NHTSA and other sources for plaintiff's attorneys and consumers.  Three of the probes resulted in recalls for floor mats.  Five were closed, meaning NHTSA found no evidence of a defect.  In four of the five cases that were closed, Tinto and Santucci worked with NHTSA on Toyota's responses to the consumer complaints the agency was investigating, agency documents show.

44.     The Toyota Defendants are estopped from relying on the statute of limitations as a defense because Toyota actively concealed the acceleration defects by, among other things, suppressing reports or complaints, failing to follow through on NHTSA notification requirements, and failing to disclose known defects.  Instead of revealing the defects, Toyota continued to represent that their cars and trucks were safe for their intended use.

45.     Toyota's conduct, as described in this complaint, amounts to conduct purposely committed, which Toyota must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of Plaintiff and consumers.

## FIRST CAUSE OF ACTION:
### Negligence

46.     Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

47.     At all times herein mentioned, Defendants Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing of North America, Toyota Motor Manufacturing, California, Inc., Toyota Motor Sales, Inc., and Toyota Motor Corporation, CTS Corporation and DOES 1 through 10, inclusive, ("Defendants"), designed, manufactured, assembled, analyzed, recommended, merchandised, advertised, promoted, distributed, supplied, and sold to distributors and retailers for sale, the subject vehicle and/or its component parts.

48.     Defendants owed Plaintiff a duty to exercise reasonable care in the design, testing, manufacture, assembly, sale, distribution and servicing of the subject vehicle, including a duty to ensure that the subject vehicle did not cause Plaintiff, other users, bystanders, or the public, unnecessary injuries or deaths.

49.     Defendants knew or should have known that the subject vehicle is defectively designed and inherently dangerous and has a propensity to suddenly accelerate, lose control, and cause injuries.

50.     Defendants knew or should have known that the subject vehicle was defectively designed and/or manufactured and was therefore prone to failure under normal driving conditions, potentially causing injuries and/or deaths.

51.     Defendants failed to exercise ordinary care and breached their duty by, among other things:

a.      Failure to use due care in the manufacture, distribution, design, sale, testing, and servicing of the subject vehicle and its component parts in order to avoid the aforementioned risks to individuals;

b.      Failure to provide adequate warning of the sudden acceleration problem and its propensity to cause and/or contribute to an accident;

c.      Failure to incorporate within the vehicle and its design reasonable safeguards and protections against sudden acceleration and the consequences thereof;

d.      Failure to make timely correction to the design of the subject vehicle to correct the sudden acceleration problems;

e.      Failure to adequately identify and mitigate the hazards associated with sudden unintended acceleration in accordance with good engineering practices and other ways; and,

f.      Were otherwise careless or negligent.

52.     The aforementioned negligent acts and omissions of Defendants were the direct and proximate cause of Plaintiff's damages.

53.     Plaintiff is, therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

## SECOND CAUSE OF ACTION:
### Strict Products Liability: Design Defect

54.     Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

55.     Defendants, and each of them, designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle and its component parts and constituents, which was intended by the Defendants, and each of them, to be used for the purpose of use as passenger vehicle, and other related activities.

56.     Defendants, and each of them, knew that said vehicle was to be purchased and used without inspection for defects by Plaintiff and the general public.

57.     The subject vehicle was unsafe for its intended use by reason of defects in its manufacture, design, testing, components and constituents, so that it

1    would not safely serve its purpose, but would instead expose the users of said

2    product to serious injuries because of the failure of Defendants, and each of them,

3    to properly guard and protect the users of the subject vehicle from the defective

4    design of said product.

5         58.   Defendants designed the subject vehicle defectively, causing it

6    to fail to perform as safely as an ordinary consumer would expect when used in an

7    intended or reasonably foreseeable manner.

8         59.   The risks inherent in the design of the subject vehicle outweigh

9    significantly any benefits of such design.

10        60.   Plaintiff was not aware of the aforementioned defects at any

11   time prior to recent revelations regarding problems with Toyota vehicles.

12        61.   As a legal and proximate result of the aforementioned defects of

13   the subject vehicle, Plaintiff sustained the injuries and damages set forth herein.

14        62.   Plaintiff is, therefore, entitled to damages in an amount to be

15   proven at the time of trial.

16        WHEREFORE, Plaintiff pray judgment against Defendants, and each

17   of them, as hereinafter set forth.

18                   **THIRD CAUSE OF ACTION:**
19                   **Strict Product Liability - Failure to Warn**

20        63.   Plaintiff hereby incorporates by reference and realleges all

21   paragraphs previously alleged herein.

22        64.   Defendants, and each of them, knew that the subject vehicle, and

23   its component parts, would be purchased and used without inspection for defects in

24   the design of the vehicle.

25        65.   The subject vehicle was defective when it left the control of

26   each of these Defendants.

27        66.   Defendants knew or should have known of the substantial

28   dangers involved in the reasonably foreseeable use of these vehicles, whose

defective design, manufacturing, and lack of sufficient warnings caused them to have an unreasonably dangerous propensity to suffer from sudden unintended acceleration and thereby cause catastrophic injuries.

67.   Defendants failed to adequately warn of the substantial dangers known or knowable at the time of the defective vehicles' design, manufacture, and distribution.

68.   Defendants failed to provide adequate warnings, instructions, guidelines or admonitions to members of the consuming public, including decedent and Plaintiff, of the design and manufacturing defects, which Defendants knew, or in the exercise of reasonable care should have known, to have existed in the subject vehicle, and its component parts.

69.   Defendants knew that these substantial dangers are not readily recognizable to an ordinary consumer and that consumers would purchase and use these products without inspection.

70.   At the time of decedent's and Plaintiff's injuries, the subject vehicle was being used in the manner intended by Defendants, and in a manner that was reasonably foreseeable by Defendants as involving substantial danger that was not readily apparent to its users.

71.   Plaintiff's damages were the legal and proximate result of the actions and inactions of the Defendants, who owed a duty to Plaintiff in designing, manufacturing, warning about, and distributing the subject vehicle.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

## FOURTH CAUSE OF ACTION:
### Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose

72.   Plaintiff hereby incorporates by reference and realleges all paragraphs previously alleged herein.

73.     Prior to the time that the subject vehicle was being used by Plaintiff at the time of the subject incident, the Defendants, and each of them, impliedly warranted to members of the general public, including Plaintiff, that the subject vehicle was of merchantable quality and safe for the use for which it was intended by the Defendants, namely, for the purpose of use as a passenger vehicle, and other related activities.

74.     Plaintiff and decedent relied on the skill and judgment of Defendants, and each of them, in the selection, purchase and use of the subject vehicle.

75.     The subject vehicle was not safe for its intended use nor was it of merchantable quality as warranted by Defendants, and each of them, in that it was defectively designed, thereby dangerously exposing the user of said vehicle and those around it to serious injury.

76.     After decedent and Plaintiff received the injuries complained of herein as a result of said defective condition of the subject vehicle, notice was given by Plaintiff to Defendants, by filing this lawsuit in the time and in the manner and in the form prescribed by law, of the breach of said implied warranty.

77.     As a legal and proximate result of the breach of said implied warranties, Plaintiff sustained the damages herein set forth.

78.     Plaintiff is, therefore, entitled to damages in an amount to be proven at the time of trial.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

### FIFTH CAUSE OF ACTION:
**(Fraud and Deceit: Fraudulent Concealment, California Civil Code §§ 1709 *et seq*., Against the Toyota Defendants Only**

79.     Plaintiff hereby incorporates by reference and realleges all paragraphs previously alleged herein.

80.     Throughout the relevant time period, Defendants knew that the subject vehicle was defective in that these vehicles have an unreasonably dangerous propensity to suddenly accelerate and thereby injure the user of these vehicles and others.

81.     In violation of California Civil Code Sections 1709 and 1710, Defendants fraudulently concealed from and/or failed to disclose to or warn Plaintiff of the true defective nature of the subject vehicle.

82.     Defendants were under a duty to Plaintiff to disclose and warn of the defective nature of the subject vehicle because: (1)  Defendants were in a superior position to know the true state of the facts about the hidden defect in the subject vehicle, and that defect was latent; (2)  Defendants made partial disclosures about the safety and quality of the subject vehicle while not revealing their true defective nature; and (3) Defendants fraudulently and affirmatively concealed the defective nature of the subject vehicle from Plaintiff.

83.     The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or operate the subject vehicle.

84.     Defendants intentionally concealed and/or failed to disclose the true nature of the problems with the subject vehicle for the purpose of inducing Plaintiff to act thereon, and Plaintiff justifiably acted or relied upon, to their detriment, the concealed and/or non-disclosed facts as evidenced by their purchase and operation of the subject vehicle.

85.     Defendants have not adequately notified past purchasers or warned future purchasers of the defect, and have not taken appropriate action to recall, buy back or retrofit their defective products.

86.     As a direct and proximate cause of Defendants' misconduct, Plaintiff has suffered actual damages.

WHEREFORE, Plaintiff demands judgment against Defendants for

compensatory damages for herself in an amount to be proven at trial, punitive

damages, equitable and/or declaratory relief, plus attorneys' fees, interest and costs.

**SIXTH CAUSE OF ACTION:**
**Violation of California's False Advertising Laws,**
**California Business and Professions Code §§ 17500 *et seq*., Against the Toyota**
**Defendants Only**

87.    Plaintiff hereby incorporates, as if set forth in full, the

paragraphs above.

88.    Business and Professions Code § 17500 provides that "[i]t is

unlawful for any . . . corporation . . . with intent . . . to dispose of . . . personal

property . . . to induce the public to enter into any obligation relating thereto, to

make or disseminate or cause to be made or disseminated . . . from this state before

the public in any state, in any newspaper or other publication, or any advertising

device, or by public outcry or proclamation, or in any other manner or means

whatever, including over the Internet, any statement . . . which is untrue or

misleading, and which is known, or which by the exercise of reasonable care should

be known, to be untrue or misleading . . ."

89.    Defendants' representations, including statements made in

Defendants' television, radio, and print advertising, websites, brochures, and all

other written and oral materials disseminated by Defendants to promote their

vehicles constitute advertising for purposes of this cause of action.

90.    Such advertising contained statements which were false,

misleading, or which omitted material information which Defendants were under a

duty to disclose and which were known or should have been known to Defendants

to be false, misleading, or deceptive.

91.    As a direct and proximate result of Defendants' misleading

advertising, Plaintiff has suffered injury in fact and has lost money or property.

92.    The misleading advertising described herein presents a

continuing threat to Plaintiffs and members of the public in that Defendants persist

and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to Plaintiffs and consumers unless restrained.

### ADDITIONAL ALLEGATIONS REGARDING CLAIM FOR PUNITIVE DAMAGES AGAINST THE TOYOTA DEFENDANTS

93.     Plaintiff incorporates by reference and hereby realleges all paragraphs previously alleged herein.

94.     At all times herein referenced, officers, directors, and managing agents of Toyota knew, and were aware, that the subject vehicle was defective and dangerous.

95.     At all times herein referenced, officers, directors, and managing agents of Toyota knew, and were aware, that numerous people had been injured or killed by these vehicles, as well as other Toyota trucks and cars with similar sudden acceleration defects.

96.     The Toyota Defendants, and each of them, designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle, and its component parts, a product which said Defendants knew to be dangerous and unsafe for the purpose for which they intended it to be used, namely, for use as a passenger vehicle.

97.     At all times herein mentioned, prior to and at the time Defendants, and each of them, sold the subject vehicle to Plaintiff, and prior to the time that said product was used by decedent, the Defendants, and each of them, knew, or should have known, that the subject vehicle, and its component parts, was defectively designed and manufactured, that it had extremely dangerous properties and defects, and that it had defects which would cause serious injuries and damage

to users of said product, thereby threatening the life and health of the users; and at all of those times,  Defendants, and each of them, knew that the defects in these vehicles had caused serious injuries and damage to other users of these vehicles.

98.     At all times herein mentioned, Defendants, and each of them, despite the actual knowledge described hereinabove, intentionally suppressed the aforementioned complaints of users, criticisms, and other information to keep such knowledge from the general public, including decedent and Plaintiff, and failed to take any steps to warn decedent or Plaintiff, or other members of the general public, of the dangers of using the subject vehicle.

99.     At all times herein mentioned, Defendants, and each of them, had actual knowledge of the facts hereinabove alleged demonstrating that serious injury to users of the subject vehicle, including Plaintiff, would potentially result. Defendants, and each of them, nevertheless deliberately failed and refused to recall the subject vehicle, or to take any other steps whatsoever to prevent such injuries. Defendants, and each of them, misrepresented the safety of the subject vehicle, and failed and refused to take any steps to prevent injuries from said vehicle in order to increase the profits of Defendants, and each of them, from the sale of said vehicle.

100.   As a legal and proximate result of the said defects and the acts and conduct of Defendants, and each of them, as hereinabove alleged, Plaintiff sustained the injuries and damages hereinabove set forth.

101.   The conduct and acts of Defendants, and each of them, as hereinabove set forth, in allowing such an extremely dangerous product to be used by members of the general public, including Plaintiff, constitute fraud, malice and oppression toward Plaintiff and others, and a conscious disregard of the safety of Plaintiff and others.

102.   Plaintiff is therefore entitled to exemplary or punitive damages, which would serve to punish the Defendants, and each of them, and to deter wrongful conduct in the future.

1    WHEREFORE, Plaintiff prays for judgment against Defendants, and
2    each of them, as hereinafter set forth.

3                      **PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiff requests of this Court the following relief:

5        A.    For general damages, in an amount to be proven at the time of
6    trial;

7        B.    For medical, incidental, hospital, psychological care and other
8    expenses, in an amount to be proven at the time of trial;

9        C.    For loss of earnings and earning capacity, in an amount to be
10   proven at the time of trial;

11       D.    For an award of pre-judgment and post-judgment interest as
12   provided by law;

13       E.    For consequential damages, in an amount to be proven at the
14   time of trial;

15       F.    For exemplary or punitive damages against Defendants Toyota
16   Motor North America, Inc., Toyota Motor Engineering & Manufacturing of North
17   America, Toyota Motor Manufacturing, California, Inc., Toyota Motor Sales, Inc.
18   and Toyota Motor Corporation, as provided by law;

19       G.    For an award providing for payment of costs of suit;

20       H.    For such other and further relief as this Court may deem just and
21   proper.

22   Dated: February 24, 2010          LIEFF, CABRASER, HEIMANN &
23                                      BERNSTEIN, LLP

24
25                                      By:_____ */s/ Elizabeth J. Cabraser*_____
                                             Elizabeth J. Cabraser
26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Elizabeth J. Cabraser (State Bar No. 083151)
*ecabraser@lchb.com*
Robert J. Nelson (State Bar No. 132797)
*rnelson@lchb.com*
Todd A. Walburg (State Bar No. 213063)
*twalburg@lchb.com*
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Attorneys for the Plaintiff*

859537.1

- 37 -

COMPLAINT FOR DAMAGES
CASE NO. _____

1

## **DEMAND FOR JURY TRIAL**

2       Plaintiff hereby demands a trial by jury on all issues which may be

3 tried by a jury.

4

5 Dated:  February 24, 2010          LIEFF, CABRASER, HEIMANN &
                                     BERNSTEIN, LLP
6

7
                                     By:_____*/s/ Elizabeth J. Cabraser*_____
8                                            Elizabeth J. Cabraser

9                                    Elizabeth J. Cabraser (State Bar No. 083151)
                                     *ecabraser@lchb.com*
10                                   Robert J. Nelson (State Bar No. 132797)
                                     *rnelson@lchb.com*
11                                   Todd A. Walburg (State Bar No. 213063)
                                     *twalburg@lchb.com*
12                                   LIEFF, CABRASER, HEIMANN &
                                     BERNSTEIN, LLP
13                                   275 Battery Street, 29th Floor
                                     San Francisco, CA  94111-3339
14                                   Telephone:  (415) 956-1000
                                     Facsimile:  (415) 956-1008
15
                                     *Attorneys for the Plaintiff*
16

17

18

19

20

21

22

23

24

25

26

27

28

859537.1                     - 38 -            COMPLAINT FOR DAMAGES
                                               CASE NO. _____